Johns *v.* Norris.

---

JOHNS and others *vs.* NORRIS and others.

1. An agreement with a defendant in execution to purchase the property for him at the sheriff's sale will not create a trust in his favor unless in writing, or fraudulently used to obtain the property at an inadequate price.

2. If an answer denies making an agreement stated in the bill, it is not necessary to plead the statute of frauds; the complainant must prove a valid agreement, which, in all cases within the statute, must be in writing.

3. As against a purchaser who holds a legal title, good on its face, by conveyance from one who is charged with fraud in acquiring it, it is necessary that the complainant should prove notice of the facts constituting the fraud.

4. Unreasonable delay in bringing suit for the specific performance of a contract to convey, will be a defence to the relief, especially where the other party has made improvements in the mean time, or the property has greatly increased in value.

5. A party cannot be charged with bad faith in making a contract to convey property bought at sheriff's sale upon such contract, if, after a delay of five years without any offer to perform by the person to whom he agreed to convey, and who should have been the actor, he makes an offer to fulfill, which is declined, and waits two years longer before he disposes of the subject of the contract.

6. An administrator is not a trustee of the real estate of his intestate for the heir, and as against the heir he may purchase for himself the real estate of the intestate at a judicial sale on foreclosure of a mortgage. He is not entitled to receive the surplus of the proceeds of the sale for the heir-at-law; it must be paid directly to the heir.

7. A purchase of the real estate of an intestate at a foreclosure sale by one who, by contrivance or fraud, had prevented a sale for a fair value, will be set aside as against the heir. But this relief will not be granted against a subsequent bona fide purchaser for a valuable consideration, without notice of the contrivance or fraud.

8. A widow who procures a person to purchase at a foreclosure sale the real estate of her late husband at prices far below its real value, by the con-

trivance agreed upon to deter bidders, by giving out that the purchase is for the benefit of the widow and her family, is a party to the fraud against the heir and creditors, and does not come into court with clean hands to compel the confederate to convey to her.

---

This cause was argued upon final hearing, upon bill, answers, and proofs.

*Mr. W. B. Williams*, for complainants.

*Mr. Ransom*, for defendants.

THE CHANCELLOR.

The complainants are Theresa Johns and Anna Maria Morehouse, the first the daughter and only heir, the other the widow of Thomas W. Morehouse, who died September 27th, 1855, intestate. Administration of his personal estate was granted to his widow, September 29th, 1855. Morehouse, before and until his death, carried on the business of a tinman at his premises in Greene street, in Jersey City; his widow, after the grant of administration, continued the business in her own name, using the assets of the estate, collecting a large amount of the credits, and paying few of the debts of the intestate. Upon application of her surety the grant of administration to her was revoked by the Hudson County Orphans Court, February 17th, 1857, and on the 25th of that month, letters *de bonis non* were granted to the defendant, Noah Norris, who, at her request, accepted them. The intestate died seized of three parcels of real estate in Jersey City, known as the York street, the Greene street, and the Grove street property, each largely mortgaged. Noah Norris had sold to him the York street property, and held a mortgage for $2000, part of the consideration, and on the 20th of February, 1857, he assigned to his brother, the defendant, John D. Norris, for full value. The Greene street property was subject to a mortgage held by Mary Bolen, the mother of the intestate, and the Grove street property to a mortgage for $2250. All three mort-

gages were for part of the purchase money, and no interest had been paid on either since the intestate's death. These mortgages were all foreclosed by the holders, and the premises sold at foreclosure sales by the sheriff. At these sales, John D. Norris bought the York street property, January 7th, 1858, for $1000. Noah Norris bought the Greene street property for $1325, November 19th, 1857, and the Grove street property, January 7th, 1858, for $2550. The only surplus on these sales above the mortgage debts was $65.98, on the Grove street sale; this was received and administered by Noah Norris, as administrator. Noah collected the remaining personal assets, and with them paid to the creditors of the intestate a dividend of twelve per cent. The residue of their claims, to the amount of several thousand dollars, are unpaid. The complainant, Theresa Johns, was, at her father's death, an infant ten years old, and of course an infant at these sales by the sheriff. She has since intermarried with Hiram C. Johns, who is joined with her in the suit as complainant.

The bill charges that these foreclosure sales were had by the advice and contrivance of Noah Norris, who was the confidential friend and business adviser of the widow. That he advised her not to pay the interest on these mortgages so that they would be foreclosed. That at the foreclosure sales he would buy in for her, and keep off other bidders by letting it be known that he was bidding for her; that he would advance the money and hold the property as a mortgagee, and that she could pay him the interest and redeem the property. It charges that the assignment of the mortgage held by Noah Norris to John D. Norris, was not bona fide, but a sham. That at all three sales, Noah Norris gave out to her and to persons present, that he was bidding for her and so deterred bidders, and by these means purchased the property at prices much below its value; that he bid off the York street property and transferred the bid to John D. Norris. That after the sale he repeatedly promised her to let her redeem the property whenever she should be

able, and acknowledged that he held it for her.   And that in 1862 and 1863, he rendered her accounts of his advances and interest on them, in the last one calculated at compound interest, showing the amounts at which he was to convey the property to her.   That in 1865 he conveyed the Grove street property to John D. Norris, and the Greene street property to his son, the defendant, Brainard T. Norris; that these transfers were not bona fide, but fraudulent and without consideration.

It charges that Noah Norris, being administrator, could not purchase the lands of his intestate at a foreclosure sale for his own benefit, but that such purchase must be in trust for the estate; and that the two other defendants knew of these equities at the transfers by him to them.   The bill prays that the purchase of Noah may be declared to have been in trust for the complainants, and that the defendants may be compelled to re-convey to them upon their repaying to Noah all moneys paid by him in the purchase.

The answers of the defendants under oath deny, positively, all the charges of the bill by which the defendants, or either of them, are sought to be affected with a trust, or with fraud, except the fact that Noah Norris was administrator of Morehouse.   They deny, fully, that Noah Norris contrived or instigated these foreclosures, or promised in any way to purchase and hold for the widow, or that he gave out to persons who might have bid, that he was buying for the widow, or that he promised afterward to hold the same for her to redeem at her pleasure.   The two other defendants deny that, at the conveyance to them, they had any knowledge or notice of these alleged facts, or that the conveyances to them were without consideration, and not in good faith.   These denials are full and responsive.

Much evidence has been taken on both sides; on many points it is very contradictory.   Much of this may be charged to inaccuracy of recollection of events that occurred ten years before, and to a warm imagination which makes narrations, often repeated by a good friend, seem as if they

were of facts seen by the witness. But after all these allowances, there must be in these contradictions bad faith. And notwithstanding the responsive answer of Noah Norris, and his positive testimony to the contrary, the weight of the evidence of more than two witnesses, compels me to believe that, at the sales of the Greene street and York street properties at least, he promised that he would buy them for the benefit of the widow, and that it was given out by him, or with his knowledge and connivance, to persons there, or who would have been at those sales, that he intended to buy for the widow.

I have further from the testimony arrived at these conclusions:

That Norris permitted the widow to occupy the Greene street property, after the sale, without rent; the only rent he exacted, was as administrator for her occupation before the sale. That in 1862 and 1863, he made out accounts, at her request, of the amounts that would be due to him on a conveyance, according to the right claimed by her, charging interest, and in the last account, compound interest. That these accounts included the York street property, which he assumed he could induce his brother to convey.

That at this time he was willing, and offered to convey, and procure his brother to convey, on these terms; and that he actually made out and submitted to Mrs. Morehouse, for her consideration, an unexecuted deed for the Grove street property, to a married woman in New York, a relative of Mrs. Morehouse, named for that purpose by her. That this, and the whole proposition to convey, was then rejected by Mrs. Morehouse, if not positively, at least by not accepting either. That her reasons for this were these: First, That the financial condition of the country, in 1862 and 1863, had not recovered from the severe depression, at the time of these sheriff's sales in the winter of 1857–8, consequent upon the failure of the Ohio Life and Trust, in the summer of 1857, and the numerous large failures which followed as its consequence. That it was still doubtful if those prices, with

interest, taxes, and expenses, did not approach so nearly to the value of these lots, as to make them a doubtful purchase. The second reason was, that Mrs Morehouse was involved in liabilities arising out of her administration, and did not want to hold any property in her own name, for fear of such liabilities. She had at this time about $2400, collected from her husband's business, or her continuation of it, and which, in good faith, should have been applied to his debts. She preferred not to invest this in redeeming his property in her own name. She told Noah Norris the conclusion to which she had arrived, if not her reasons for it; and after taking his advice as to purchase of a house with it, bought one in York street, in her daughter's name, for $3000, of which her daughter furnished $600. That after this, Mrs. Morehouse did not tender or offer to pay Noah the amount due him on her theory, or ask for a re-conveyance of the property, until after his conveyances to the other two defendants, or, in fact, until the commencement of this suit.

That the assignment of the mortgage on the York street lot, was in good faith and for a valuable consideration. That the lot was bid off, at the sheriff's sale, by John D. Norris, for his own benefit, and in good faith to save his debt. That John D. Norris purchased the Greene street property, and Brainard T. Norris the Grove street property, for valuable considerations actually paid, and without any notice or knowledge at the times of such purchases, respectively, that Noah Norris had agreed to buy these lots for the widow, or that he caused or permitted to be given out to any one that he intended to purchase for the widow, or that he did any act that is charged as a fraud upon that sale, except that they knew that he was then the administrator of Morehouse. The conclusions stated in this paragraph, are arrived at from the positive denials in the answer, and the utter want of any testimony to contradict these denials. And there is no evidence from which such notice can be inferred. There are circumstances surrounding each case that warrant suspicion, and that would give great support to

any positive testimony that these purchases were not in good faith and without notice. The fact that Brainard made out the account, in 1862 and 1863, for Mrs. Morehouse, is perfectly consistent with the extent of knowledge, admitted by him; that is, that his father had offered, or was willing, that Mrs. Morehouse might take all her husband's property, upon indemnifying him. The statement of these two defendants is neither impossible nor incredible; nor are they so improbable as to cause hesitation in believing them. As there is no other evidence they must prevail.

The purchase of the York street lot by John D. Norris, if we take his uncontradicted answer or evidence, is free from every thing that would amount to a fraud or constitute a trust. He neves promised, directly or indirectly, to buy for the widow, and used no means to discourage bidders. And the amount due on his mortgage was, probably, more than any one would have bid at a cash sale of this property, in the financial situation of the country at that time.

The questions as to the other two parcels, so far as Noah is concerned, depend upon the contract with Mrs. Morehouse, to purchase for her; the fraud of Norris at the sale; and his duty, as administrator, to protect the heir and creditors.

As to the contract, it is not in writing, and is void by the statute of frauds. In the case of *Merritt* v. *Brown*, 6 *C. E. Green* 401, Chief Justice Beasley, in delivering the opinion of the court, says: "When, therefore, the elements of the case are simply a purchase, under a parol promise to hold for the benefit of the defendant in execution, I think such an arrangement, the statute of frauds being set up as a defence, cannot be enforced either at law or in equity." The opinion subsequently holds, that if the contract, or any other contrivance, is used by the purchaser to obtain the property in execution for an inadequate price, the title to equitable relief is clear; but that even in this class of cases, the purchaser should be protected against all pretences of a trust by parol, unless his mala fides be proved by the clearest and

most direct evidence. In that case the agreement was admitted in the answer, and the statute of frauds not set up in the defence, and, therefore, could not protect the defendant. But in this case the agreement is fully denied in the answers; and then the rule in equity is, that the statute of frauds can be relied on. The complainant is then bound to prove a legal agreement, which, in cases like this, must be in writing. *Browne on Stat. of Frauds*, § 511; *Ontario Bank* v. *Root*, 3 *Paige* 478; *Cozine* v. *Graham*, 2 *Paige* 181.

No relief then can be had upon this agreement. In the same case the Court of Appeals held, in accordance with the opinion of the Chancellor, that the complainant had lost his title to relief, by his laches or delay in bringing suit. In that case, the complainant made no offer to fulfill in two years; in the mean time the value of the property had increased, and the defendant had, with the complainant's knowledge, put improvements upon it. Here, the delay was for ten years, and the increase in value and the improvements are both much greater. This delay must bar all remedy on the contract. Nor is any mala fides, in regard to this contract, proved by clear evidence, or proved at all. On the contratry, the weight of evidence is, that it was both made in good faith and so offered to be fulfilled. A party to a contract who, after a delay of five years, without any offer to fulfill by the other party, that should have been the actor, makes an offer on his part to fulfill, which is declined, and who, after waiting two years longer, sells the subject of the contract, can hardly be charged with bad faith in making it; and this is the only bad faith that can entitle to relief in equity on a parol contract.

The fraud in the sale, if any, was as to the heir of Morehouse, Theresa Johns, or rather as to his creditors, for, evidently, nothing would have been left to her by a fair sale. It consisted in deterring purchasers, by declaring that the property was bought for the widow, who, by this means, would have acquired the title for an inadequate price, to the injury of the creditors and the heir. If this was a fraud, the

widow was a party to it, and the party who was to receive the whole benefit. She cannot come into equity for relief against her confederate. In this affair her hands are not clean. The complainant, Theresa, if this was a fraud unconnected with the contract, might be entitled to relief against it. She is the heir, and has not participated in any of these transactions, much less in any fraud. But she is entitled to no relief founded on this agreement; it was not with her or for her.

But as against her, the two defendants, John D. Norris and Brainard T. Norris, must be regarded as bona fide purchasers without notice. There was no pretence, on part of the complainants, that either of them had any notice or intimation of the contrivance to deter bidders, which was the only fraud against the heir or the creditors. If Brainard had been told by his father, when directed to make out the accounts, that he had bought the property at sheriff's sale, under this agreement with Mrs. Morehouse, it would have been no notice of this contrivance in which the fraud consists; and Theresa has no claim under the agreement.

It is claimed that Noah Norris, as administrator, was trustee for the heir and creditors, and, therefore, had no right to purchase any of the estate for himself, and that the other defendants had notice of this fact.

Noah Norris, as administrator, was a trustee of the personal estate for the creditors and next of kin. He had no power over the real estate, nor trust as to it. He could only meddle with that by an order of the Orphans Court that he should sell it. Such order was never made. Either he or the creditors could have applied for it. It was not his duty more than it was theirs. But if it was his duty, it was a duty only to the creditors, not to the heir. His power in this was controlled by the mortgagees and the foreclosure suits, one of which was commenced before the grant of administration to him. He, as administrator, had no right to the surplus on these sales, except to pay debts; and even for that purpose it was doubtful, until the act of

Thompson *v.* German Valley R. Co.

March 31st, 1869, whether he could have obtained the surplus of a sale made more than a year after Morehouse's death. Theresa could have obtained it, if not needed by the creditors. He could not have prevented her. It was not only not his duty to apply for her, but he could not have applied for her unless specially authorized by her. Under the law, as it now stands, the administrator can only get so much of such surplus as is needed for the payment of debts; the residue will be ordered to be paid to the heir, not through the administrator, but directly. Norris was in no sense a trustee for Theresa as to her father's real estate. And she can have no remedy as against him, or his vendees, founded on such supposed trust.

There is no need to determine that he was such trustee as to creditors, until a suit shall be brought by them.

The bill must be dismissed.